UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Gertrude T. Guard, | : | Civil No. 1:14-CV-02239 |
| | : | |
| Plaintiff, | : | (Chief Judge Conner) |
| | : | (Magistrate Judge Saporito) |
| v. | : | |
| | : | |
| Carolyn W. Colvin, | : | |
| | : | |
| Defendant. | : | |

REPORT AND RECOMMENDATION

I.   INTRODUCTION:

Plaintiff Gertrude T. Guard ("Guard"), an adult individual who resides in the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claims for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1383(c)(3).

This matter has been referred to the undersigned United States Magistrate Judge to prepare a report and recommended disposition pursuant to the provisions of 28 U.S.C. §636(b) and Rule 72(b) of the Federal Rules of Civil Procedure.  For the reasons expressed herein, we

have found that the final decision of the Commissioner of Social Security is supported by substantial evidence. Accordingly, it is recommended that the final decision of the Commissioner denying Guard's claims for benefits be AFFIRMED, and that Guard's request for a new hearing or the award of benefits be DENIED.

II.   FACTS AND PROCEDURAL HISTORY:

As of the date of her administrative hearing, Guard was fifty years old. (Admin Tr. 40). She completed high school and attended three years of college but did not complete her degree. (Admin Tr. 41-42). Guard previously worked as an adult care technician, a mini-mart clerk, and as a mail clerk/loan processor. Guard reported that she, and a number of other employees, were laid off in February 2011. (Admin Tr. 45). She also reported that the layoff occurred shortly after she was involuntarily committed following a suicide attempt in January 2011. Guard explained that she attempted suicide because she felt her job was in jeopardy despite the fact that she was performing well at work. (Admin Tr. 46). Guard reported that after her attempted suicide she informed her employer that "there's going to be times where I'm just going to have to walk out,"

because she could not deal with all of the people due to stress. (Admin Tr. 45).

Guard lives alone in a one-bedroom basement apartment, but her daughter checks on her each day. (Admin Tr. 49-50).  She reported that she is unable to do her own laundry, cannot cook meals that require her to stand for long periods of time, and can clean her apartment only "to a point." (Admin Tr. 50).  Guard reported that her daughter and upstairs neighbor vacuum, but that she can do dishes herself.  Id.  Guard is able to read and watch television.  She does not have access to a computer but is able to use a smart phone. (Admin Tr. 50-51).  Guard reported that she is able to go grocery shopping in stores once per month when accompanied by her daughter. (Admin Tr. 54).

On July 18, 2012, Guard protectively filed applications for social security disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act.  In both applications she alleged that her disability began on February 15, 2011, as a result of the following conditions: neck problems, back pain, heart problem, depression, and suicide. (Admin Tr. 182).  Guard's claims were initially

denied on October 12, 2012. Following this denial, Guard filed a written request for an administrative hearing. Her request was granted, and on May 19, 2013, with the assistance of counsel, Guard appeared and testified during an administrative hearing held before Administrative Law Judge Gerard Langan ("the ALJ") in Wilkes-Barre, Pennsylvania. Impartial vocational expert Michele C. Giorgio ("VE Giorgio") also appeared and testified during Guard's hearing.

During her hearing, Guard testified at great length about the nature, severity, and limiting effects of her impairments. Guard reported that she does not like people or the public. (Admin Tr. 46). She also reported that, when she leaves her home she gets panic attacks, starts to shake, and hyperventilates. (Admin Tr. 53). Guard also reported that she has no energy, lacks the motivation to tend to her personal hygiene unless she has to go out, and regularly goes one week without showering. (Admin Tr. 56-57).

In January 2011, several stressors, including a recent breakup with her fiancé, the possibility of her home going into foreclosure, and her employer's announcement that they would be doing layoffs led Guard to

overdose on her prescribed medications of Ativan and Temazepam. (Admin Tr. 273). Guard reported that, during the month leading up to a five-day period of involuntary commitment, she had been increasingly depressed and anxious, experienced episodes of racing thoughts, and felt panicky. Id. When Guard was discharged from the hospital it was noted that Guard would be following up with Dr. Matthew Berger's office, and would be seeing a therapist named Andrea. (Admin Tr. 274). Guard admitted that she did not follow up with Dr. Berger because she had no reliable transportation to appointments. (Admin Tr. 47). There is no evidence in the record that Guard saw a therapist after she was released.

In addition to her mental impairments, Guard also reported several physical ailments. Guard testified that she began to experience persistent knee pain in the fall of 2012. (Admin Tr. 47). The medical record reflects that Guard was examined at the Geisinger Wyoming Valley Emergency Department on October 22, 2012, with complaints of left knee pain. (Admin Tr. 307). X-rays revealed no evidence of fracture. (Admin Tr. 309). On November 1, 2012, and December 3, 2012, Guard's knee was examined at the Orthopaedic Institute. During both examinations, it was

noted Guard exhibited flexion between 90 and 95 degrees that was limited by pain,[1] medial joint line tenderness in the left knee, and mild tenderness to palpation over the patellar tendon in her left knee.  (Admin Tr. 312, 324).  Although the initial assessment was a probable meniscal tear, this condition was subsequently ruled out by an MRI.  After the MRI, it was noted that Guard had left knee pain of uncertain etiology with a normal MRI and pain out of proportion to the expected findings, and that the orthopaedist was really not sure whether Guard's knee was the source of her pain.  (Admin Tr. 313).  During the second examination, the orthopaedist administered a cortisone injection and recommended that if the injection did not relieve Guard's pain that Guard should "look into her back or other reasons for her pain."  Id.  There is nothing in the record that suggests that Guard followed up with additional treatment after the cortisone injection in December 2012.

Guard has alleged that her knee, back, and neck impairments result in a significant degree of physical limitation.  Guard testified that, if she is leaning against something, she can stand up to ten minutes at one time.

---

[1] The normal or full range of motion of the knee on flexion and extension is approximately 150 degrees.  (See e.g., Admin Tr. 278).

(Admin Tr. 52).  Guard testified that she could sit up to fifteen minutes at a time before she begins to shift positions in her seat or get up and walk around to alleviate her discomfort.  Id.  She reported that she uses a cane "sometimes."  (Admin Tr. 53).  Guard testified that she can walk up to one block at a time.  (Admin Tr. 52).  Guard testified that she can lift no more than five pounds, but has no difficulty performing tasks that require fine manipulation of her hands and fingers.  Id.

Guard also testified that she gets migraines three days per week which cause the additional symptoms of sensitivity to light, sensitivity to sound, and nausea.  (Admin Tr. 49).  She testified that she constantly has a headache.  Id.

In addition to her testimony, Guard also completed a function report in August 2012 describing her impairments and their resulting limitations.  Guard reported that her impairments affect her abilities to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, concentrate, and get along with others.  (Admin Tr. 169).  Guard reported that she is confined to her bed for days at a time due to severe migraine headaches, that she finds it difficult to be around people due to anxiety

and depression, and that she gets panic attacks whenever she leaves her home. (Admin Tr. 164). Guard reported that she has no problems attending to her own personal hygiene, and is able to prepare her own simple one-course meals, clean her apartment and do laundry, leave her home unaccompanied, and shop in stores for food. She reported that she communicates with her sister-in-law via text message every day, and talks to her boyfriend every day. (Admin Tr. 168). She reported that she is able to follow written and spoken instructions, gets along with authority figures, and has never been fired or laid off because of problems getting along with other people. (Admin Tr. 170). However, she reported that she does not handle stress or changes in routine well, and fears that someone wants to kill her. (Admin Tr. 170). Guard also reported that she cannot lift more than two pounds and cannot walk more than two hundred feet at one time. (Admin Tr. 169).

Guard reported that she is not currently on any prescribed medications because she cannot afford to pay for them. (Admin Tr. 171).

On April 26, 2013, the ALJ issued a written decision denying Guard's applications for benefits. Guard sought review of the ALJ's

decision by the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council"). Her request, however, was denied on September 23, 2014.

On November 23, 2014, Guard initiated this matter by timely filing a complaint in this United States District Court. (Doc. 1). In her complaint, Guard alleges that the ALJ's decision denying her applications for benefits must be reversed because it is not supported by substantial evidence, and contains errors of law. (Doc. 1 ¶¶14, 15). As relief, she requests that this Court reverse the ALJ's decision denying her claims and award her the benefits to which she believes she is entitled, or in the alternative remand this matter to the Commissioner to conduct a new administrative hearing. (Doc. 1 p. 3).

On February 2, 2015, the Commissioner filed an answer to Guard's complaint. (Doc. 11). In her answer, the Commissioner denies the allegations in Guard's complaint, and asserts that the ALJ's decision denying Guard's claims is correct and in accordance with the law and regulations, and that the ALJ's findings of fact are supported by substantial evidence. (Doc. 11 ¶10).

This matter has been fully briefed by the parties and is now ripe for decision.  (Docs. 17, 20, 23).

III.   LEGAL STANDARDS:

　　A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT:

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200(3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536(M.D.Pa. 2012).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the

evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Guard is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. <u>See</u> <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); <u>Burton v. Schweiker</u>, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d

675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

    B.   <u>Initial Burdens of Proof , Persuasion and Articulation for the ALJ</u>:

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must also show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date

on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's

medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. §423(d)(5); 42 U.S.C. §1382c(a)(3)(H)(i)(incorporating 42 U.S.C. §423(d)(5) by reference); 20 C.F.R. §§404.1512, 416.912; Mason, 994 F.2d at 1064.

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the

decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Com. of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

C.    Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence:

The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions. 20 C.F.R. §§404.1527(a)(2), 416.927(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §§404.1527(c), 416.927(c).

15

In deciding what weight to accord to competing medical opinions, the ALJ is guided by factors outlined in 20 C.F.R. §§404.1527(c) and 416.927(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally are entitled to more weight. See 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §§404.1502, 416.902 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following

factors, where applicable, in deciding the weight given to any non-controlling medical opinions; length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §§404.1527(c), 416.927(c).   At the initial level of administrative review, State agency medical and psychological consultants may act as adjudicators. See SSR 96-5p, 1996 WL 374183 at *4. As such, they do not express opinions; they make findings of fact that become part of the determination.  Id.  However, 20 C.F.R. §§404.1527(e) and 416.927(e) provide that at the ALJ and Appeals Council levels of the administrative review process, findings by nonexamining State agency medical and psychological consultants are evaluated as expert opinion evidence by nonexamining physicians and psychologists and must be addressed by the ALJ.  SSR 96-5p, 1996 WL 374183 at *6.  Opinions by State agency

consultants can be given weight "only insofar as they are supported by evidence in the case record."  SSR 96-6p, 1996 WL 374180 at *2.  In appropriate circumstances, opinions from nonexamining State agency medical or psychological consultants may be entitled to greater weight than the opinions of treating or examining sources.  Id. at *3.

Furthermore, as discussed above, it is beyond dispute that, in a social security disability case, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. This principle applies with particular force to the opinion of a treating physician.  See 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").  "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)(quoting Mason, 994 F.2d at 1066)); see also Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).

D.   The Formulation of Proper Hypothetical Questions for Vocational Experts:

One of the principal contested issues in this setting relates to the claimant's residual capacity for work in the national economy. There are two ways a claimant can frame a challenge to an ALJ's reliance on vocational testimony at step five. Rutherford v. Barnhart, 339 F.3d 546, 554 n. 8 (3d Cir. 2005). First, the claimant can argue that the testimony cannot be relied upon because the ALJ failed to convey limitations to the VE that were properly identified in the RFC assessment. Id. Second, the claimant can argue that the VE's testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and thus did not convey those limitations to the VE. Id. In either scenario, as an evidentiary matter, the ALJ's error precludes reliance on the VE's response to the faulty hypothetical question. Challenges of the latter variety, like those raised in this case, are best understood as challenges to the RFC assessment itself. Id.

In this regard, the controlling legal standards are clear, and clearly defined. As the United States Court of Appeals for the Third Circuit has observed:

> Discussing hypothetical questions posed to vocational experts, we have said that "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." Podedworny, 745 F.2d at 218. A hypothetical question posed to a vocational expert "must reflect *all* of a claimant's impairments." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir.1987) (emphasis added). Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence. Podedworny, 745 F.2d at 218 (citing Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150, 1155 (3d Cir.1983)).

Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002).

IV.   DISCUSSION:

A.      THE ALJ'S DECISION DENYING MS. GUARD'S APPLICATIONS FOR BENEFITS:

In his April 26, 2013, decision denying Guard's claims, the ALJ found that Guard meets the insured status requirements of the Social Security Act through March 31, 2016. (Admin Tr. 22). At step one the ALJ found that Guard had not engaged in substantial gainful activity

since her alleged onset date.  (Admin Tr. 22).  At step two the ALJ found

that Guard had the medically determinable severe impairments of

depression, post-traumatic stress disorder ("PTSD"), osteoporosis of the

left knee, and neurofibromatosis.[2]  (Admin Tr. 22).  The ALJ also found

that Guard had the medically determinable non-severe impairments of

asthma and chronic obstructive pulmonary disease ("COPD").  Id.  At step

three the ALJ found that Guard did not have an impairment or

combination of impairments that met or medically equaled the severity of

an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1

("listing of impairments").  (Admin Tr. 23-24).

Between steps three and four of the sequential evaluation process

the ALJ assessed Guard's RFC.  After evaluating the relevant evidence of

record, the ALJ found that Guard had the RFC to perform light work as

defined in 20 C.F.R. §§404.1567(b) and 416.967(b), except that:

> [t]he claimant must avoid concentrated exposure to
> unprotected heights.  She can never climb ropes,
> ladders and scaffolds.  The claimant must avoid

---

[2]Neurofibromatosis is a condition characterized by developmental changes in the nervous system and other structures, with formation of small tumors on an individual's peripheral nerves.  Dorland's Illustrated Medical Dictionary 1265 (32nd ed. 2012).

> concentrated exposure to extreme cold
> temperatures.  She can have occasional interaction
> with the public, co-workers and supervisors.  The
> claimant can understand, remember and carry out
> simple instructions and make simple work-related
> decisions with few work place changes.

(Admin Tr. 24).

In making his factual findings with respect to Guard's RFC, the ALJ was required to evaluate credibility Guard's statements pursuant to 20 C.F.R. §§ 404.1529 and 416.929, and SSRs 96-4p and 96-7p, and assess the weight of the opinion evidence of record pursuant to 20 C.F.R. §§404.1527, 416.927, and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.  In doing so, the ALJ accorded weight to the mental status examination and medical source statement by nontreating consultative examiner Tiffany Griffiths ("Dr. Griffiths"), accorded "great" weight to the psychiatric review technique ("PRT") assessment and mental RFC assessment by nonexamining State agency psychologist John Chiampi ("Dr. Chiampi"), and agreed with the physical RFC assessment by nonexamining state agency medical consultant Louis Tedesco ("Dr. Tedesco") but found that Guard was slightly more limited than Dr. Tedesco opined.  (Admin Tr. 26-27).  The ALJ accorded "little" weight to the medical source statement by nontreating

consultative examiner Seema Kumari ("Dr. Kumari") that Guard was limited to lifting and carrying no more than three pounds, and standing or walking for no more than fifteen minutes because these findings were inconsistent with the objective evidence of record. (Admin Tr. 26). The ALJ also noted that Guard was assessed with a GAF score of 20 upon being involuntarily committed following a suicide attempt, but accorded this GAF score "little" weight since it was given during a period when Guard exhibited "fleeting suicidal ideation due to situational problems with her boyfriend." Id. The ALJ acknowledged that, on discharge from a period of involuntary commitment, and again during a one-time examination by Dr. Griffiths, Guard was assessed with a GAF score of 50. The ALJ did not articulate what weight, if any, he accorded to these scores. (Admin Tr. 26, 27).

After weighing the documentary and testimonial evidence, the ALJ found that Guard's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible, and that Guard retained the capacity engage in the type of work described by his RFC assessment.

At step four of the sequential evaluation process, the ALJ relied upon the testimonial evidence from VE Giorgio.  VE Giorgio testified that Guard's past relevant work as an adult care technician and mail clerk/loan processor was semi-skilled in nature, and that an individual with the RFC described, individual could not engage in either position.  VE Giorgio also testified that an individual who was limited to no more than occasional interaction with the public, co-workers, and supervisors could not engage in Guard's past relevant work as a mini-mart clerk.  (Admin Tr. 60-61).  Relying on this testimony, the ALJ concluded that Guard could not engage in any of her past relevant work.  (Admin Tr. 28).

At step five of the sequential evaluation process, the ALJ, once again, called upon the services of VE Giorgio in order to determine whether Guard could engage in "other work" that existed in significant numbers in the national economy.  After considering the factual findings made by the ALJ with respect to Guard's age, education, work experience, and RFC, VE Giorgio testified that such an individual could engage in occupations such as general office clerk (e.g., DOT #222.587-038, Router), food preparation worker (e.g., DOT #529.686-014, cannery worker), or mail clerk (e.g., DOT

#209.687-026, mail clerk).  (Admin Tr. 61-62).  VE Giorgio's testimony also

revealed that these positions, considered together, exist in 422,795 jobs in

the national economy, and 21,395 jobs in the state economy.  Id.  Based on

this information, the ALJ concluded that Guard could engage in other work

that existed in significant numbers in the national economy despite her

medically determinable impairments.

B.  THE ALJ'S DECISION TO DISCOUNT DR. KUMARI'S MEDICAL
SOURCE STATEMENT IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

On September 24, 2012, Guard was examined by Dr. Kumari.  The

record in this case contains a medical report from this examination, as well

as a completed range of motion chart and a medical source statement of

Guard's ability to engage in physical work-related activities.  (Admin Tr.

276-291).[3]  Guard told Dr. Kumari that she was having knee pain, back

_____

[3]The record contains three copies of Dr. Kumari's examination
report.  The only discernable difference between these reports is the
location of steroid injections administered "a few years back."  The first
copy of Dr. Kumari's report indicates that Guard had 12 steroid injections
in both knees, (Admin Tr. 280), the second copy indicates that Guard had
12 steroid injections in her neck, (Admin Tr. 284), and the third indicates
that Guard had 12 injections in her neck or lower back, (Admin Tr. 288-
89).  This discrepancy has little bearing on our review of this matter.  All
citations to this report are to the first copy that appears in the record.
(see Admin Tr. 280-83).

pain, and neck pain that had persisted for the past ten years and worsens with physical activity.   (Admin Tr. 280).   Guard also complained of constant migraine headaches, and reported a history of mitral valve prolapse and neurofibromatosis. Id. On physical examination, Dr. Kumari noted that there was no swelling or tenderness in the knee, back, or neck. (Admin Tr. 382).  Guard's flexion at the back was limited to sixty degrees,[4] but rotational and lateral rotation was normal, and Guard's range of motion in her neck was normal.  Id.  Guard's range of motion in her knee was normal, but she did exhibit crepitus in the left knee during flexion.  Id. Despite his own observations of a lack of tenderness in Guard's neck, back, and knee, Dr. Kumari opined in his medical source statement that Guard could: lift or carry no more than three pounds; stand or walk no longer than fifteen minutes per day due to her back and knee problems; sit less than six hours per day due to back and knee pain; and frequently bend, kneel, stoop, crouch, balance, and climb.  (Admin Tr. 276-77).  The ALJ accorded "little" weight to Dr. Kumari's opinion that Guard could not stand

---

[4]The normal or full range of motion in the lumbar spine upon flexion is ninety degrees.  (Admin Tr. 279).

more than fifteen minutes per day and could not lift or carry more than three pounds.  (Admin Tr. 26).

Guard argues that the ALJ failed to give proper weight to the opinion of Dr. Kumari.  (Doc. 17 pp. 5-8); (Doc. 23 pp. 1-3).  Guard contends that the ALJ's decision to accord "little" weight to Dr. Kumari's medical source statement because the lifting, carrying, standing and walking limitations contained therein were "clearly inconsistent with [her] findings upon physically examining the claimant," is erroneous and constitutes an improper substitution of an ALJ's lay opinion for that of a medical source. (Doc. 17 p. 6).

As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor," because "lay intuitions about medical phenomena are often wrong."  Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990).  However, in this case the ALJ's assessment that Dr. Kumari's medical source statement is inconsistent with his examination report is supported by medical opinion evidence.  In his physical RFC assessment, Dr. Tedesco noted that "[n]ontreating provider MSS by Kumari, M.D.

opines limitations for lifting, carrying, standing, walking & sitting.  The opinion is an overestimate of limitations and is for impairments the provider did not tx." (Admin Tr. 73).  The ALJ explained in his decision that he agreed with Dr. Tedesco's finding that Guard was capable of engaging in light work. (Admin Tr. 27).  Because the ALJ's assessment that Dr. Kumari's medical source statement was "clearly inconsistent" with her report is corroborated by a medical opinion that the ALJ relied upon we find that this does not constitute the improper substitution of an ALJ's own lay opinion for that of a medical source.

Next, Guard argues that the ALJ's conclusion that Dr. Kumari's medical source statement is "also inconsistent with the objective evidence of record" is erroneous.  (Doc. 17 p. 7-8); (Doc. 23 pp. 1-2).  Guard cites to several pieces of evidence including records from an emergency room visit and visits to an orthopaedic clinic.

As noted by the ALJ in his decision, on October 11, 2012, Guard was examined at the Geisinger Wyoming Valley Emergency Department ("Geisinger Emergency Department").  (Admin Tr. 25).  Guard reported that she had a one-month history of left knee pain that had been gradually

worsening since onset, but that she had not sought treatment due to a lack of insurance.  (Admin Tr. 307).  Guard expressly denied any trauma that could have led to her injury.  Id.  She reported that her pain was exacerbated with palpation, extension, ambulation, and weight-bearing, and that she had been taking Tylenol without relief.  Id.  Guard also admitted that she had been using a cane to walk since the onset of her symptoms.  Id.  X-rays revealed no acute fracture, and a bony lesion to the medial tibia of questionable significance.  (Admin Tr. 308).  The x-rays also showed that Guard's bones were osteoporotic.  (Admin Tr. 311).  Guard's knee was placed in a knee immobilizer, she was offered crutches but declined, and no medication was prescribed.  (Admin Tr. 309).

Th ALJ also noted that Guard was examined at an orthopaedic clinic on November 1, 2012. (Admin Tr. 25); (see also Admin Tr. 323-34).  Guard reported that her left knee pain had persisted for two months, and that she experienced occasional "locking" of the left knee such that she sometimes had to use her arms to get her knee to unlock.  Id.  On examination the orthopaedist noted minimal effusion, medial joint line tenderness, mild tenderness to palpation over the patellar tendon on the left, and no

crepitus.  Id.  He diagnosed a probable meniscal tear, but this diagnosis was subsequently ruled out by an MRI.  Id.; (see also Admin Tr. 320).  The MRI also revealed multiple T1 hypointense and T2 hyperintense lesions in the soft tissues of the knee compatible with neurofibromas.  (Admin Tr. 320).  During a follow-up examination with a second orthopaedist at the same clinic, it was noted that Guard had a very limited range of motion secondary to pain that was greater than expected given the essentially normal imagining studies.  (Admin Tr. 312-13).  The orthopaedist noted that he was not sure whether Guard's pain originated from her knee and noted that it was possible that Guard's pain was coming from her back or hip.  Id.  No surgical intervention was recommended.  Id.  Instead, a cortisone injection was administered and it was recommended that Guard look in to her back or other possible explanations for her pain if the injection did not improve her pain.  Id. Guard did not return for additional treatment between December 3, 2012, the date of her follow-up appointment, and March 19, 2013, the date of her administrative hearing.

We find that the ALJ's conclusion that the medical evidence is inconsistent with the standing, walking, lifting, and carrying limitations

is a reasonable interpretation of the evidence, and is corroborated by the medical opinion of Dr. Tedesco. Moreover, although the ALJ clearly credits that Guard is in some pain, there is objective evidence in Dr. Kumari's report that suggests that her pain was "mild" and that she had a normal range of motion. (Admin Tr. 282). As such, we find that the ALJ's decision to discount the extreme limitations in Dr. Kumari's medical source statement that Guard could not lift or carry more than three pounds or stand for more than fifteen minutes per eight-hour day due to pain is supported by substantial evidence.

    C.   <u>The ALJ's RFC assessment adequately accounts for Guard's "marked" difficulty responding to work pressures in a usual work setting.</u>

Guard asserts that, although the ALJ generally credited the medical source statement by Dr. Griffiths, he erred by omitting a marked limitation identified by Dr. Griffiths without explaining his decision to do so. (Doc. 17 p. 10); (Doc. 23 pp. 3-5). Guard argues that VE Giorgio's testimony that no work would be available to an individual who would be off task at least twenty percent of the work day establishes that Guard's marked inability to respond to work pressures in a usual work setting

would preclude employment. Id.  In response, the Commissioner contends that the ALJ was not required to incorporate every limitation identified by Dr. Griffiths, and that the ALJ's RFC assessment limiting Guard to simple, routine tasks involving no more than simple, short instructions, simple work-related decisions, and few work place changes with no more than occasional interaction with co-workers, supervisors, or the public adequately accounted for the marked inability to respond to work pressures in a usual work setting.  (Doc. 20 pp. 14-15).  Therefore, we are called upon to decide whether the ALJ's RFC adequately accounted for the marked limitation in responding appropriately to work pressures identified by Dr. Griffiths.

In her medical source statement, Dr. Griffiths was asked to rate Guard's ability to engage in certain activities on the following scale: none, slight, moderate, marked, and extreme.[5]  (Admin Tr. 292).  Dr. Griffiths

_____

[5]The medical source statement completed by Dr. Griffiths defines each term on its rating scale as follows: "none" is defined as "[a]bsent or minimal limitations"; "slight" is defined as "some mild limitations in the area but the individual can generally function well"; "moderate" is defined as a "moderate limitation" that does not prevent the individual from functioning satisfactorily; "marked" is defined as a "serious limitation" that severely limits, but does not preclude, an individual's ability to

(continued...)

was also directed to identify the factors that support her assessment.  <u>Id.</u>
In section two of her medical source statement, Dr. Griffiths noted that
Guard's ability to respond appropriately to supervision, co-workers, and
work pressures was affected by her impairment.  (Admin Tr. 293).  Dr.
Griffiths opined that Guard would have moderate difficulty interacting
appropriately with supervisors, co-workers, and the public, moderate
difficulty responding appropriately to changes in a routine work setting,
and marked difficulty responding appropriately to pressures in a usual
work setting.  <u>Id.</u> Dr. Griffiths explained that her assessment is supported
by her clinical observations that Guard "has become avoidant as a result
of her depression" which "has increased the anxiety she experiences in the
general public realm," and also noted that Guard "is easily overwhelmed."
<u>Id.</u>

Given the factual underpinnings of this case, we find that the
Commissioner is correct that the ALJ accounted for all of the clinical
observations underlying Guard's difficulty responding to pressures in the

---

[5](...continued)
function; and, "extreme" is defined as a major limitation  and precludes
any useful ability to function.  (Admin Tr. 292).

workplace by limiting her exposure to conditions that aggravate her anxiety and leave her feeling overwhelmed. Specifically, the ALJ's RFC assessment limits the amount of time that Guard would be expected to interact with co-workers, supervisors, or the public to less than three hours per eight-hour workday, and limits the nature of the work to be performed by restricting Guard to simple tasks that would be subject to few workplace changes.

Accordingly, we find that because the ALJ's RFC assessment accounted for the "marked" difficulty responding to pressures in the workplace, he did not err by failing to explain why he rejected this limitation.

Furthermore, we are not persuaded by Guard's assertion that she would be off task twenty percent of each workday due to this limitation. Dr. Griffiths' medical source statement is clear that although the depressive features of Guard's mental impairments make it difficult for her to complete tasks, she would have only "slight" difficulty understanding and remembering short, simple instructions, and only moderate difficulty (i.e. would be able to satisfactorily perform) the activities of carrying out

simple instructions.  (Admin Tr. 293).  Although she opined that Guard would have greater difficulty understanding and remembering detailed tasks, the ALJ accounted for these limitations by precluding the performance of such tasks in his RFC assessment.  Moreover, Dr. Chiampi, whose opinion the ALJ accorded "great" weight, noted that Guard would have only "moderate" difficulty maintaining attention and concentration for extended periods.  (Admin Tr. 86).

### D.  REMAND IS NOT NECESSARY FOR FURTHER EXPLANATION OF THE ALJ'S EVALUATION OF THE GAF SCORES OF RECORD.

Global Assessment of Functioning ("GAF") scores "are used by mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults." Irizarry v. Barnhart, 233 F.App'x 189, 190 n. 1 (3d Cir, 2007); see also Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000)(hereinafter "DSM-IV TR"). The GAF scale ranges from 0 to 100, and is divided into ten ranges of functioning.  The description of each 10-point range in the GAF scale has two components; the first part covers symptom severity, and the second part covers overall functioning.  DSM-IV TR at 32.  The GAF score falls within a particular ten-point range if either the symptom severity *or* the

level of functioning falls into that range.  Id.  "[I]n situations where an individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two." Id. At 33.  In 2000, the Commissioner explained that, as a matter of policy, a GAF score does not have any direct correlation to the severity requirements of the Social Security mental disorder listings.  See Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 FR 50746-01, 50764-65 (Aug. 21, 2000).  Nonetheless, because it is the scale used by mental health professionals to "assess current treatment needs and provide a prognosis,"  65 FR 50746 at *50765, "it constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability." Sweeney v. Comm'r of Soc. Sec., 847 F.Supp.2d 797, 802 (W.D.Pa. 2012)(quoting Wiggers v. Astrue, 2010 WL 1904015, at *8 (W.D.Pa. May 10, 2010)).  In 2013, the American Psychiatric Association dropped the GAF scale from the  new edition of the Diagnostic and Statistical Manual of Mental Disorders due to its conceptual lack of clarity

and questionable psychometrics in routine practice.[6]  See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013)(hereinafter "DSM-5").  The American Psychiatric Association's departure from the GAF score, however, does not by itself affect the Commissioner's position with respect to the significance of this type of evidence in the context of evaluating claims for benefits under the Social Security Act.

Guard's mental health treatment records contain three GAF scores. Guard's discharge summary from her five-day period of involuntary commitment in January 2011 reflect that her GAF at admission on January 9, 2011, was 20, and her GAF score at discharge on January 14, 2011, was 50.  (Admin Tr. 273).  During her consultative examination with Dr. Griffiths on September 18, 2012, Guard was assessed with a GAF score of 50.  (Admin Tr. 297).  The ALJ acknowledges each of these GAF scores

_____

[6]Guard appears to rely on language quoted from an internal administrative message issued by the Commissioner after the publication of the DSM-5 as a reminder to her adjudicators that GAF ratings will be considered as medical opinion evidence under 20 C.F.R. §§404.1527(a)(2) and 416.927(a)(2).  (Doc. 17 pp. 12-13); (Doc. 23 p. 6).  This administrative message ("AM-13066") has been relied on by the courts in other cases, however, no copy of this message has been included in the record before this Court and is not otherwise available through any traditional means of legal research.

in his decision, but only expressly discounts Guard's GAF score of 20 because it "was given during a period when the claimant had a fleeting suicidal ideation due to situational problems with her boyfriend." (Admin Tr. 26). Guard asserts that "[t]he ALJ erred in this case by completely ignoring the GAF score of 50 assessed by the Horsham Clinic upon release and the GAF score of 50 assessed by Dr. Griffiths." (Doc. 17 p. 12).

As Guard points out, a GAF score of 41 to 50 indicates that in the opinion of the evaluator the patient has:

> **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job).

DSM-IV TR 34 (boldface in original). Courts have consistently held that an ALJ's failure to discuss low GAF scores in cases where the ALJ relies on higher GAF scores constitutes grounds for remand. See Irizarry, 233 F.App'x at 192 (remanding where the ALJ's opinion noted a GAF score of 55 but omitted two lower GAF scores). However, the Third Circuit has also held that an ALJ's failure to explicitly reference each GAF score of record does not warrant remand where the ALJ was not "cherry-picking" or

ignoring medical assessments that ran counter to his or her conclusion. Rios v. Comm'r of Social Sec., 444 F.App'x 532, 534-35 (3d Cir. 2011); see also Gilroy v. Astrue, 351 F.App'x 714, 716 (3d Cir. 2009)(holding that an ALJ's failure to discuss a treating psychiatrist's one-time GAF rating of 45 did not warrant remand because the ALJ made repeated references to observations in the psychiatrist's reports and because the reports did not explain the basis for the GAF rating).

Guard argues that "[w]hile not binding on the Commissioner, the GAF scores are certainly probative evidence of disability which the ALJ failed to address."  (Doc. 23 at 6).  However, as aptly noted by the Commissioner, the ALJ's decision does reflect that he *considered* each GAF score, even if he did not explain the weight he accorded to them.  (Doc. 20 p. 19); (see Admin Tr. 26)(noting a GAF score of 50 at discharge from the Horsham Clinic); (see also Admin Tr. 26)(noting that Dr. Griffiths assessed a GAF score of 50).

Although the ALJ's failure to explain the weight accorded to these GAF scores may be in error, Guard has failed to persuade us that there is any possibility that further consideration of this evidence might lead to a

different result on remand and is therefore harmless.  If credited, a GAF

score of 50  would not require a finding of disability.  <u>See e.g.</u>, <u>Gilroy v.</u>

<u>Astrue</u>, 351 F.App'x 714, 715-16 (3d Cir. 2009)("a GAF score of 45, if

credited, would not require a finding of disability.").  Furthermore, as

alluded to in <u>Gilroy</u>, although a GAF score between 41 and 50 is fairly

understood to convey a belief that an individual has either serious

symptoms or a serious impairment in social or occupational functioning,

the relevance of  a raw GAF score in this context is limited where the

clinician fails to provide any explanation for that belief.  <u>Gilroy</u>, 351

F.App'x at 715-16.  Neither the discharge summary nor Dr. Griffiths'

report explains the basis for either GAF assessment (e.g., whether the GAF

score is based on the presence of serious symptoms, a serious functional

limitation, or both).  Moreover, the ALJ's decision reflects that he

throughly considered Guard's January 2011 discharge summary and Dr.

Griffiths' report and medical source statement.  For these reasons we are

at a loss to understand how the ALJ could have responded to the disputed

GAF ratings in a more satisfactory manner.  Accordingly, because "[n]o

principle of administrative law or common sense requires us to remand a

case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result," <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989), we find that remand is not warranted for further discussion of either GAF score.

E.   <u>ADEQUACY OF THE ALJ'S HYPOTHETICAL QUESTION</u>:

Guard alleges that the ALJ's hypothetical is incomplete because he failed to account for the "moderate" limitation in concentration, persistence, or pace he identified at step three of the sequential evaluation process. (Doc. 17 pp. 14-15); (Doc. 23 pp. 7-10).   In response, the Commissioner asserts that the ALJ's RFC adequately accounts for all of Guard's credibly established limitations.  (Doc. 20 p. 21).  Thus, we are called upon to decide whether the ALJ improperly omitted his own finding that Guard had moderate difficulties maintaining concentration, persistence or pace.

In support of her argument, Guard relies on <u>Ramirez v. Barnhart</u>, a case where the Third Circuit held that a finding that a claimant "often" experienced difficulty in concentration, persistence, or pace was not adequately conveyed where the ALJ limited a claimant to simple one to

two step tasks.  372 F.3d 546, 554 (3d Cir. 2004).  However, in subsequent

administrative decisions:

> the Social Security Administration amended the
> scale used to rate the degree of limitation in the
> area of concentration, persistence or pace. The old
> scale was based on the frequency that a limitation
> would impact a claimant's activities (never, seldom,
> often   frequent,   constant),   20   C.F.R.   §§
> 404.1520a(b)(3) (1999), 416.920a(b)(3) (1999), while
> the current scale (used by the ALJ in this case)
> rates the overall severity of the limitation itself
> (none, mild, moderate, marked, extreme). 20 C.F.R.
> §§   404.1520a(c)(4),   416.920a(c)(4).   Neither   the
> Administration nor the Third Circuit has offered
> any comment as to whether there is a correlation
> between the points on the frequency scale and the
> points on the severity scale.
> The District Courts within this Circuit have
> addressed similar issues following this regulatory
> change with varying results. At least one district
> court has found that there is no correlation
> between the frequency and severity scales and
> questioned the continuing validity of Ramirez in
> cases involving the application of the severity scale.
> See Rodgers v. Colvin, No. 13–75, 2014 WL
> 4748907, at *1 n. 1 (W.D.Pa. Sept.24, 2014). Other
> district courts have found the opposite and have
> held that Ramirez still applies because the terms
> "often" used in frequency regulations and the term
> "moderate" found in severity rules are equivalent.
> See Jury v. Colvin, 2014 WL 1028439 at *11 n. 21
> (M.D.Pa. Mar.14, 2014) (citing Strouse v. Astrue,
> No. 07–4514, 2010 WL 1047726, at *6 (E.D.Pa.

Mar.19, 2010); <u>Dynko v. Barnhart</u>, No. 03–cv–3222,
2004 WL 2612260, at \*5 (E.D.Pa. Nov.16, 2004)).

<u>Bryant v. Colvin</u>, No. 4:14-cv-981, 2015 WL 1401001 at \*11-12

(M.D.Pa. Mar. 16, 2012).

However, even assuming that <u>Ramirez</u> applies in this case we find

that there are material differences between the facts in this matter and

<u>Ramirez</u> which lead us to conclude that the ALJ's decision in this matter

should be affirmed.  For example, in <u>Ramirez</u>, a medical expert that the

ALJ credited in his decision testified that the claimant's anxiety disorder

could impair her ability to meet production quotas, and the VE testified

that an inability to meet production quotas would preclude the

performance of all positions identified.  <u>Ramirez</u>, 372 F.3d at 554-556.

Although the VE in this case did testify that an individual who would be

off task up to 20 percent of each working day would be unemployable,

unlike in <u>Ramirez</u>, Guard has failed to identify any credible medical

evidence that suggests that her impairments would result in her being off

task twenty percent of each workday.  As such, we find that this argument

lacks merit.

V.  RECOMMENDATION:

Accordingly, for the foregoing reasons, **IT IS RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED** and that Guard's requests for the award of benefits or remand for a new administrative hearing be **DENIED**.

<u>**s/ Joseph F. Saporito, Jr.**</u>
**Joseph F. Saporito, Jr.**
**U.S. Magistrate Judge**


**Dated: December 8, 2015**

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Gertrude T. Guard, | : | Civil No. 1:14-CV-02239 |
| | : | |
| Plaintiff, | : | (Chief Judge Conner) |
| | : | (Magistrate Judge Saporito) |
| v. | : | |
| | : | |
| Carolyn W. Colvin, | : | |
| | : | |
| Defendant. | : | |

## NOTICE

Notice is hereby given that the undersigned has entered the forgoing

Report and Recommendation dated December 8, 2015. Any party may

obtain a review of this Report and Recommendation pursuant to Local

Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed
> findings, recommendations or report addressing a
> motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or
> making a recommendation for the disposition of a
> prisoner case or a habeas corpus petition within fourteen
> (14) days after being served with a copy thereof. Such
> party shall file with the clerk of court, and serve on the
> magistrate judge and all parties, written objections
> which shall specifically identify the portions of the
> proposed findings, recommendations or report to which
> objection is made and the basis for such objections. The
> briefing requirements set forth in Local Rule 72.2 shall
> apply. A judge shall make a de novo determination of
> those portions of the report or specified  proposed
> findings or recommendations to which objection is made

and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely Objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.


**_s/ Joseph F. Saporito, Jr._**
**Joseph F. Saporito, Jr.**
**U.S. Magistrate Judge**

**Dated: December 8, 2015**